IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| ASHOOR RASHO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 11-cv-1308 |
| | ) |
| DIRECTOR ROGER E. WALKER, | ) |
| JR., DR. WILLARD ELYEA, DR. | ) |
| WENDY NAVARRO, EDDIE JONES, | ) |
| DR. JOHN GARLICK, and DR. | ) |
| MICHAEL F. MASSA, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**FIRST SEVERED COMPLAINT**

Plaintiff Ashoor Rasho, an inmate in the custody of the Illinois Department of Corrections (the "IDOC") and currently incarcerated at Stateville Correctional Center ("Stateville"), hereby complains as follows:

1.  Mr. Rasho brings this lawsuit pursuant to 42 U.S.C. § 1983 to redress violations of his rights under the Eighth and Fourteenth Amendments to the United States Constitution to be free of cruel and unusual punishment that occurred while Mr. Rasho was incarcerated at Pontiac Correctional Center ("Pontiac").

**PARTIES**

2.  Plaintiff Ashoor Rasho is currently incarcerated at Stateville. He was previously incarcerated at Pontiac and, before that, Tamms Correctional Center ("Tamms"). Mr. Rasho has a history of auditory hallucinations, suicide attempts, and self-mutilation.

3.  At all times relevant to this Complaint, Defendant Roger E. Walker Jr. was the Director of the IDOC. As such, he had overall responsibility for IDOC's policies and procedures

1

and the administration of all correctional facilities within the State, as well as personal, first-hand knowledge of the operations of Pontiac.

4. At all times relevant to this Complaint, Defendant Dr. Willard Elyea was the Medical Director of the IDOC. As such, he had overall responsibility for providing health care, including mental health care, to inmates in the custody of the IDOC, including inmates at Pontiac.

5. At all times relevant to this Complaint, Defendant Dr. Wendy Navarro was the Chief of Mental Health and Psychiatric Services for the IDOC. As such, she had immediate and overall responsibility for the mental health and psychiatric care of inmates in the custody of the IDOC, including inmates at Pontiac.

6. At all times relevant to this Complaint, Defendant Eddie Jones was the Warden of Pontiac Correctional Center. As such, he had ultimate responsibility for the entire operation of the institution, including implementing all state laws and the IDOC's policies, practices, and procedures affecting prisoners confined at Pontiac, its mental health unit, and its segregation units.

7. At all times relevant to this Complaint, Dr. John Garlick was the Supervising Clinical Psychologist at Pontiac. Dr. Garlick provided mental health services to prisoners at Pontiac and oversaw the mental health staff who serve as the prison mental health professionals.

8. At all times relevant to this Complaint, Dr. Michael F. Massa was one of the psychiatrists at Pontiac. Dr. Massa provided mental health services to prisoners at Pontiac's mental health unit and administered psychotropic drugs to them.

## JURISDICTION AND VENUE

9. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).

10. Venue is proper in the Central District of Illinois under 28 U.S.C. § 1391(b) because at least one of the Defendants resides in the District and a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in the District.

## FACTS

### I. The Failure to Provide Constitutionally-Required Mental Health Care to Inmates in IDOC's Custody Generally

11. Mentally ill inmates in IDOC facilities are chronically underdiagnosed and undertreated. Even for those prisoners identified as needing mental health care, such as Mr. Rasho, the care is grossly substandard.

12. One measure of the deficiency in treatment is how few of IDOC's adult correctional centers provide any sort of specialized mental health services at all. The State of Illinois currently has only four adult correctional facilities (out of a total of 28) which contain a specialized mental health unit: Dixon Correctional Center ("Dixon"), Pontiac, Tamms (the state's "super-max" facility), and Dwight Correctional Center.

13. Access to the limited number of specialty mental health units is difficult, as there are not enough beds in those units to accommodate all of the seriously mentally ill prisoners in the prisons operated by the IDOC. As a result, prisoners with obvious mental health needs are not transferred to specialized mental health units, and prisoners are refused transfers to these specialized units for reasons that have nothing to do with mental health treatment considerations (e.g., in retaliation for complaints about staff behavior).

14. Grievances by inmates as to the quality of care provided in the mental health units are treated not as complaints about care, but as challenges to being assigned there. Prisoners are transferred out of mental health units in retaliation for filing a grievance, assisting other inmates in grieving, or other reasons having nothing to do with psychiatric care. Within the mental

3

health treatment units, patients with a wide variety of problems are grouped together and treated by the same methods without regard for their differing diagnoses, symptoms, or treatment needs.

15. What limited and erratic care there is, is provided chiefly by medication. A prisoner with serious mental illness may see a psychiatrist once a month, to "re-up" his medications, and a social worker once a month. It can be very easy to get off medications: just ask, or stop taking the medications. There are no adequate mechanisms in place to monitor whether mentally ill inmates are really taking the medications they are prescribed, or to encourage them, through therapeutic contact, to stick with their medication regimes.

16. When prisoners have consultations with mental health professionals, they are often forced to do so in the form of conversations at the cell door, where not only correctional staff but other prisoners can eavesdrop. This severely compromises the ability to treat any mental illness, since it requires a prisoner to identify his symptoms in a setting where other prisoners can readily hear. This gives prisoners an incentive to minimize problems, and thus gives the IDOC a reason not to provide treatment.

17. The diagnosis of – or failure to diagnose – inmates' mental health problems by mental health professionals in IDOC facilities, and the day-to-day treatment of mentally ill prisoners by staff, is routinely poisoned by the notion of "offender manipulation," and mentally ill inmates are routinely categorized as uncooperative malingerers. Both regular staff and supposed mental health "professionals" fail to recognize the "uncooperative" and "manipulative" conduct as the symptoms of mental illness that they are.

18. Correctional staff often do not respond to prisoners' threats to harm themselves. Prisoners on suicide and/or crisis watch are neglected, abused, or both.

19. Inmates who engage in conduct due to their mental illnesses are punished in absurd and irrational ways.

20. Mentally ill inmates accumulate large amounts of segregation time for disciplinary infractions caused by their mental illness, but their mental illness is not considered or taken into account in the hearings about their infractions. Prisoners are housed in segregation and given little or no mental health care. It is well-known that placing mentally ill inmates in segregation or isolation is highly likely to exacerbate their mental illness. Even without mental illness, many prisoners in isolation experience mental deterioration; isolation is especially dangerous to those who are already mentally ill. Studies have found that the effects of isolation include: paranoid psychosis and uncontrolled rage, including increased homicidal and suicidal impulses; frequent schizophrenia; and impairment of the ability to socially reconnect with others once released. Yet mentally ill prisoners still accumulate years upon years of "seg" time in the IDOC.

21. Likewise, prisoners who were originally incarcerated for comparatively minor offenses (e.g., burglary) can end up spending more time in prison due only to their mental illness than those convicted of much more serious offenses.

22. The units in which mentally ill prisoners are housed – both the mental health units themselves and other locations where they may be placed – are often filthy, vermin-ridden, and filled with human waste. This is true of individual cells and of common areas, such as showers. Staff do not clean them, and inmates are not able to clean them.

23. In the Pontiac "North Segregation" Unit, where Mr. Rasho was housed for much of the time relevant to this Complaint, inmates were given a half cup of green soap once a week

5

to clean their cells. In the beginning, they are also given a sponge, but once the sponge wears out they are not given a new one.

24. The failure to provide constitutionally-required mental health care to mentally ill inmates such as Mr. Rasho is the result of policies, practices, protocols, and/or customs enacted, implemented, and/or carried out by Defendants Walker, Elyea, Navarro, and Jones.

**II. The Failure to Provide Mr. Rasho with Constitutionally-Required Mental Health Care While at Pontiac**

25. Plaintiff Ashoor Rasho has been incarcerated in the IDOC since 1996 and was transferred to Pontiac on November 7, 2003, where he remained until March 22, 2011, when Mr. Rasho was transferred to Stateville.

26. Mr. Rasho arrived at Pontiac with a well-documented history of serious mental illness, which manifested itself through self-mutilation, suicide attempts, and auditory hallucinations.

27. Prior to arriving at Pontiac, Mr. Rasho had been treated with a wide variety of psychotropic medications, including Sinequan, Wellbutrin, Prozac, Remeran, and BuSpar. At various times, Mr. Rasho had been deemed so mentally ill that doctors took the extreme step of forcing him to take some or all of these medications against his will.

28. For some period of time after he was first transferred to Pontiac, Mr. Rasho's mental health was reasonably stable.

29. However, in spring 2004, Mr. Rasho stopped taking his medication and began cutting himself again.

30. When Mr. Rasho stopped taking his medication and began cutting himself again in spring 2004, he was transferred to Pontiac's mental health unit by then-Pontiac psychiatrist Dr. Kowalkowski.

6

31. After being transferred to Pontiac's mental health unit by Dr. Kowalkowski, Mr. Rasho resumed medication and stabilized. However, he later stopped taking his medication again, and resumed self-mutilating.

32. Between November 2004 and October 2005, Mr. Rasho cut himself on at least five occasions, requiring between 6 and 16 stitches on each occasion.

33. Despite Mr. Rasho's history of mental illness and self-destructive behavior, reflected in his records and in his conduct at Pontiac under their watch, and despite his ongoing self-harm behaviors, in 2006 Dr. Massa and the other members of the Pontiac psychiatric team, including Dr. Garlick, determined to transfer Mr. Rasho out of the mental health unit and into the "North Seg[regation]" unit.

34. Drs. Massa and Garlick determined to transfer Mr. Rasho out of the mental health unit and into the "North Segregation" unit not because Mr. Rasho would no longer benefit from placement in that unit, but because Mr. Rasho complained about staff behavior in the mental health unit.

35. Drs. Massa and Garlick did not determine to transfer Mr. Rasho out of the mental health unit and into the "North Segregation" unit for any legitimate medical or therapeutic reason.

36. Drs. Massa and Garlick transferred Mr. Rasho out of the Pontiac mental health unit although they were well aware of Mr. Rasho's history of serious mental health problems and the fact that he still had serious mental illness and repeatedly harmed himself by cutting large, deep wounds on his arms.

37. As a result of the transfer out of the Pontiac mental health unit, Mr. Rasho's mental state deteriorated further.

7

38. In August 2006, Mr. Rasho cut himself again and was transferred first to the health care unit, where he was put on crisis watch.

39. While on crisis watch at the health care unit, the staff told Mr. Rasho to "call when he hit an artery" and left him alone as he was in the act of cutting himself. When he triggered the sprinkler head in the cells, he was removed, and received 15 stitches. Despite this incident, Mr. Rasho was thereafter returned to North Segregation per Dr. Massa's and Dr. Garlick's instructions.

40. Mr. Rasho repeatedly requested transfer back to the mental health unit, but his pleas were disregarded by Dr. Massa and Dr. Garlick.

41. Despite refusing to place Mr. Rasho in the Pontiac mental health unit, the Pontiac mental health staff, including Dr. Massa and Dr. Garlick, consistently prescribed powerful combinations of antidepressant and antipsychotic drugs for Mr. Rasho.

42. The Pontiac mental health staff, including Dr. Massa and Dr. Garlick, were aware of and acknowledged Mr. Rasho's serious mental illness even as they denied him treatment, denied him access to programs available in the mental health unit, and exacerbated his mental illness by placing him in a segregation environment.

### III. Failure To Establish Policies and Protocols

43. While mentally ill prisoners such as Mr. Rasho are treated by on-site medical personnel such as Drs. Massa and Garlick, the treatment provided is determined by protocols developed or approved by Drs. Elyea and Navarro.

44. Upon information and belief, the protocols developed by Drs. Elyea and Navarro failed to provide an effective mechanism for the diagnosis and treatment of mentally ill prisoners such as Mr. Rasho, and to ensure continuity of treatment as they were transferred between prisons.

45. Upon information and belief, the protocols developed or approved by Drs. Elyea and Navarro for the treatment of mentally ill prisoners did not provide for placement of such prisoners in specialized mental health treatment units, and instead allowed them to be placed in highly restrictive environments such as Pontiac's North Segregation Unit.

46. Drs. Elyea and Navarro developed or approved these protocols with actual knowledge that environments such as Pontiac's North Segregation Unit were toxic to the mental health of prisoners suffering from serious mental illness such as Mr. Rasho.

IV. **Placement of Mr. Rasho In An Environment Toxic to His Mental Health**

47. Defendants Jones and Walker were responsible for the assignment of prisoners, and for establishing the rules, policies and procedures governing the operation of the various housing units, including the North Segregation Unit at Pontiac.

48. Once Mr. Rasho was removed from the Pontiac mental health unit, he was assigned to Pontiac's North Segregation Unit.

49. Prisoners placed in Pontiac's North Segregation Unit had virtually no movement out of their cells, minimal contact with other prisoners, and were provided with virtually no access to mental health professionals on an on-going basis.

50. Conditions in the Pontiac's North Segregation Unit were toxic to the mental health of prisoners such as Mr. Rasho who suffered from severe mental illness.

51. Mr. Rasho filed numerous grievances regarding his deteriorating mental health once he was placed in Pontiac's North Segregation Unit.

52. Mr. Rasho's grievances regarding his placement in North Segregation, rather than the mental health unit, were either ignored or denied by Warden Jones.

53. Despite the obvious risks of harm to Mr. Rasho, a seriously mentally ill person, caused by being placed in a segregation unit instead of a specialty mental health care unit, his

9

grievances were denied, and he was told by Warden Jones that the "nature of his grievance could not be determined."

54. Mr. Rasho's privacy was invaded by his treatment at Pontiac, in that he was forced to have conversations with mental health staff within the hearing of non-mental-health professionals, including correctional staff and other prisoners.

## COUNT I

**(For Compensatory and Punitive Damages Against Defendants Walker, Elyea, Navarro, and Jones)**

55. Plaintiff Ashoor Rasho realleges and incorporates by reference Paragraphs 1 to 54 as if alleged herein.

56. At all times relevant to this Complaint, Plaintiff Ashoor Rasho had serious medical conditions. Specifically, Mr. Rasho suffered from serious mental illnesses.

57. Defendants Walker, Elyea, Navarro, and Jones (the "Count I Defendants") knew that Mr. Rasho and other inmates in the custody of the IDOC suffered from serious mental illnesses but they disregarded the risks posed by these serious mental illnesses.

58. The Count I Defendants' knowledge and disregard of the serious mental illnesses that inmates in the custody of the IDOC, including Mr. Rasho, suffer from and the risks posed by such illnesses constitutes deliberate indifference.

59. In so doing, Defendants Walker, Elyea, Navarro, and Jones have violated Mr. Rasho's rights under the Eighth and Fourteenth Amendments of the United States Constitution to be free from cruel and unusual punishment.

60. The Count I Defendants' violations of Mr. Rasho's constitutional rights placed Mr. Rasho at an unreasonable and foreseeable risk of developing or exacerbating serious medical and mental health problems.

61. The Count I Defendants' violations of Mr. Rasho's constitutional rights inflicted both physical and mental harm and injury to Mr. Rasho, including by causing avoidable pain, mental suffering, and deterioration of his health.

## COUNT II

**(For Compensatory and Punitive Damages against Defendants Jones and Walker)**

62. Plaintiff Ashoor Rasho realleges and incorporates by reference Paragraphs 1 to 61 as if alleged herein

63. Conditions in Pontiac's North Segregation Unit, at least as to prisoners such as Mr. Rasho, failed to meet the minimal standards required by the Eighth Amendment to the Constitution of the United States.

64. Defendants Jones and Walker (the "Count II Defendants") placed Mr. Rasho in these conditions, and maintained these conditions, with actual knowledge of the toxic effect those conditions would have on prisoners with serious mental illness.

65. The Count II Defendants failed to take reasonable steps to protect Mr. Rasho from the toxic effect of the conditions of the North Segregation Unit with actual knowledge of the dangers that the conditions in Pontiac's North Segregation Unit posed to mentally ill prisoners such as Mr. Rasho.

## COUNT III

**(For Compensatory and Punitive Damages against Defendants Garlick and Massa)**

66. Plaintiff Ashoor Rasho realleges and incorporates by reference Paragraphs 1 to 10 and 25 to 42 as if alleged herein.

67. At all times relevant to this Complaint, Plaintiff Ashoor Rasho had serious medical conditions. Specifically, Mr. Rasho suffered from serious mental illnesses.

68.	Defendants Garlick and Massa (the "Count III Defendants") knew of and disregarded Mr. Rasho's serious mental illnesses and the risks posed by such illnesses.

69.	The Count III Defendants' knowledge and disregard of Mr. Rasho's serious mental illnesses and the risks posed by such illnesses constitutes deliberate indifference.

70.	In so doing, Defendants Garlick and Massa have violated Mr. Rasho's rights under the Eighth and Fourteenth Amendments of the United States Constitution to be free from cruel and unusual punishment.

71.	The Count III Defendants' violations of Mr. Rasho's constitutional rights placed Mr. Rasho at an unreasonable and foreseeable risk of developing or exacerbating serious medical and mental health problems.

72.	The Count III Defendants' violations of Mr. Rasho's constitutional rights inflicted both physical and mental harm and injury to Mr. Rasho, including by causing avoidable pain, mental suffering, and deterioration of his health.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Ashoor Rasho requests that this Court enter judgment in his favor and:

(a)	Award Plaintiff Ashoor Rasho compensatory and punitive damages for the violations of his constitutional and legal rights;

(b)	Award Plaintiff Ashoor Rasho costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

(c)	Award any such further relief as the Court may deem just.

August 17, 2011

                                                              /s/ _____
                                                                     One of his attorneys

Marc R. Kadish
Matthew V. Wargin
William R. Stone
MAYER BROWN LLP
71 S. Wacker Dr.
Chicago, IL 60606
(312) 701-8747 (phone)
(312) 706-8774 (fax)
*mkadish@mayerbrown.com*
*mwargin@mayerbrown.com*
*wstone@mayerbrown.com*

Alan Mills
UPTOWN PEOPLE'S LAW CENTER
4413 N. Sheridan Rd.
Chicago, IL 60640
(773) 769-1410 (phone)
*alanmill@aol.com*

13

700281198