UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| ASHOOR RASHO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 11-1308 |
| | ) | |
| ROGER E. WALKER, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

Now before this Court are Defendants Dr. Willard Elyea, ("Dr. Elyea"), Dr. Wendy Navarro[1] ("Dr. Navarro"), Eddie Jones ("Jones"), Dr. John Garlick's ("Dr. Garlick") Motion for Summary Judgment (ECF No. 60) and Defendant Dr. Michael F. Massa's ("Dr. Massa") Motion for Summary Judgment (ECF No. 62) on Plaintiff's claim of deliberate indifference to his serious medical need. For reasons stated herein, the Motions for Summary Judgment (ECF Nos. 60 and 62) are GRANTED.

## PROCEDURAL BACKGROUND

On August 16, 2011, Plaintiff Ashoor Rasho ("Rasho" or "Plaintiff") filed a three count Complaint (ECF No. 5) against Dr. Elyea, Dr. Navarro, Jones, Dr. Garlick and Dr. Massa[2]. In Count I, Rasho alleges that Defendants Dr. Elyea, Dr. Navarro, and Jones were deliberately indifferent to his mental illnesses because they were aware he "suffered from serious mental illnesses but they disregarded the risks posed by these serious mental illnesses." (ECF No. 5 at 10). In general, Rasho asserts that "[t]he failure to provide constitutionally-required mental

---

[1] Dr. Navarro is now known as Dr. Blank.

[2] A suggestion of death was filed on April 2, 2012, noting that Defendant Roger E. Walker had died during the pendency of this action. (ECF No. 20).

health care to mentally ill inmates such as Mr. Rasho is the result of policies, practices, protocols, and/or customs enacted, implemented, and/or carried out by Defendants Walker, Elyea, Navarro, and Jones." (ECF No. 5 at 6).

In Count II, Rasho alleges that Defendant Jones placed him in Pontiac Correctional Center's North Segregation Unit which failed to meet the Eighth Amendment's minimal standards because prisoners housed in segregation are "given little or no mental health care," and that certain studies have found that prisoners in isolation experience mental deterioration. (ECF No. 5 at 5).

In Count III, Rasho alleges that Defendants Dr. Garlick and Dr. Massa were deliberately indifferent to Rasho's mental illnesses because, despite their knowledge of his history of mental illness and self-destructive behavior, Defendants Dr. Garlick and Dr. Massa transferred him out of Pontiac's Mental Health Unit ("MHU") and into the North Segregation unit. Rasho claims this transfer was "not… for any legitimate medical or therapeutic reason" but "because [he] had complained about staff behavior in the mental health unit." (ECF No. 5 at 7). Rasho also alleges that although Dr. Massa and Dr. Garlick were aware of his serious mental illness as evidenced by their "consistent [prescription of] powerful combinations of antidepressant and antipsychotic drugs," they ordered him back to the North Segregation unit and refused his requests to be returned to the MHU. (ECF No. 5 at 8).

The Defendants assert that they are entitled to summary judgment. Defendants Dr. Elyea, Dr. Navarro, Jones and Dr. Garlick contend that the undisputed facts demonstrate that they were not deliberately indifferent to the Plaintiff's serious mental health needs. (ECF No. 61 at 14, et seq.). These Defendants also argue that they are entitled to qualified immunity. (ECF No. 61 at 20, et seq.). Defendant Dr. Massa argues that summary judgment in his favor is appropriate

because he was not deliberately indifferent to any serious medical need, there is a lack of personal involvement of Dr. Massa to prove liability under § 1983, Dr. Massa cannot be responsible under any *respondeat superior* or vicarious liability theory, the Plaintiff does not have the right to placement in any specific facility, that there is no evidence that Dr. Massa caused any physical injury to the Plaintiff, and he is entitled to qualified immunity. This Order follows.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A movant may demonstrate the absence of a material dispute through specific cites to admissible evidence, or by showing that the nonmovant "cannot produce admissible evidence to support the [material] fact." Fed. R. Civ. P. 56(c)(1)(B). If the movant clears this hurdle, the nonmovant may not simply rest on his or her allegations in the complaint, but instead must point to admissible evidence in the record to show that a genuine dispute exists. *Id.*; *Harvey v. Town of Merrillville*, 649 F.3d 526, 529 (7th Cir. 2011). "In a § 1983 case, the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forward with sufficient evidence to create genuine issues of material fact to avoid summary judgment." *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010).

At the summary judgment stage, evidence is viewed in the light most favorable to the nonmovant, with material factual disputes resolved in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists when a reasonable juror could find for the nonmovant. *Id.*

## FACTUAL BACKGROUND

Initially, it should be noted that Dr. Massa's Motion for Summary Judgment included over four hundred and fifty "undisputed material facts." (ECF NO. 62 at 3-75). Plaintiff objected to the "undisputed material facts" asserting that the majority of the purported facts had no bearing on the outcome of the case. (ECF No. 63 at 2). Ultimately, the Defendants agreed to withdraw some of the undisputed material facts and the Court directed the Plaintiff to focus on those facts that are truly material. (*See* TEXT ORDER dated 4/12/2013). Additionally, Defendants Dr. Elyea, Dr. Navarro, Jones and Dr. Garlick's Motion for Summary Judgment contains over one hundred purported "undisputed material facts." (ECF No. 60 at 2-14). Of course, many of the Defendants' purported "undisputed material facts" are not "undisputed" nor "material."

Nonetheless, this initial factual background is intended to provide an overview of the case, and additional facts (undisputed and/or disputed) that actually have bearing on the Parties' positions will be highlighted in the discussion section below. Parenthetically, the Court recognizes that this case has been separated from a larger action styled *Rasho, et al. v. Director Roger E. Walker, Jr., et al.*, ILCD Case No. 07-cv-1298. The facts and findings herein are related *only* to this Plaintiff's individual action, and the positions and arguments presented herein. (*See e.g.* ECF No. 72-10 at 11-12, Plaintiff's expert was not critical of the care *Rasho* received while in Pontiac's MHU. Put another way, this Order is not intended to assess IDOC's delivery of mental health services to mentally ill offenders in general.

**Identification of the Parties and Plaintiff's Claims**

Ashoor Rasho

Rasho is an inmate housed within the Illinois Department of Corrections ("IDOC"). Rasho has been in the custody of IDOC since 1996. In 2003, Rasho was transferred to Pontiac Correctional Center. On or around April 6, 2004, Dr. Kowalkowski, a psychiatrist that treated Rasho, recommended that Rasho be transferred to MHU. Rasho has been diagnosed with various mental illnesses including "Axis I diagnosis of history of polysubstance abuse and dependence and Axis II diagnosis of antisocial personality disorder, and borderline personality disorder. (*See* ECF No. 62 at 49). In November 2006, Rasho was transferred out of the MHU, and has not since been transferred back to the MHU. As noted above, Rasho was transferred from MHU to Pontiac's North Segregation unit. In 2011, Plaintiff was transferred to Stateville Correctional Center, where he remained for approximately 11 months. Rasho then returned to Pontiac Correctional Center in 2012.

Dr. Michael Massa

Dr. Massa was employed at Pontiac Correctional Center from March 31, 2006, until July 26, 2011, as a staff psychiatrist, and his primary role was to diagnose and, treat patients and manage psychiatric medications. Dr. Massa contends that there were no differences with regard to the treatment available to prisoners in the MHU as compared to prisoners at Pontiac in other units. On May 25, 2006, Dr. Massa documented that the team recommended that Plaintiff be transferred off the MHU. In Dr. Massa's opinion, Plaintiff did not have a diagnosis or a set of symptoms that would be benefitted by his continuing in the MHU. When Defendant saw Plaintiff again on August 3, 2006, Defendant again recommended that Plaintiff be considered for transfer off the MHU and Defendant's handwritten note indicated that the treatment team was to

consider Plaintiff's transfer off the MHU. On that date, Dr. Massa also documented that in his opinion, Plaintiff was clearly demonstrating a flare up consistent with antisocial personality disorder. Dr. Massa asserts that he recommended that Plaintiff be transferred off the MHU due to his diagnosis, his behavior, and his manipulation. Dr. Massa apparently believed that the MHU would not serve Plaintiff or anyone who has been diagnosed with antisocial personality disorder. At the time Dr. Massa was seeing Plaintiff, it was Dr. Massa's stated opinion that Plaintiff was not benefitting from being placed in the MHU and that Plaintiff was a detriment to others who were properly placed in the MHU. On November 4, 2006, Dr. Massa saw Plaintiff and in his stated opinion, Plaintiff was not demonstrating a need for pharmacologic intervention at that time. Dr. Massa believed he did not see Plaintiff again after November 4, 2006, and shortly after that date, as noted above, Rasho was transferred out of MHU and was placed under other psychiatrists' care. Plaintiff alleges that Dr. Massa's decision to transfer Rasho out of the MHU constituted deliberate indifference to his medical needs.

<u>Dr. John Garlick</u>

Dr. Garlick is a psychologist and held the position of Psychology Services Administrator at Pontiac Correctional Center since 2004. Dr. Garlick was also on the placement review board at Pontiac, which reviews placement of inmates in the MHU. Dr. Garlick was a member of the review board that approved Rasho's transfer to the North Segregation unit. Plaintiff alleges that "Dr. Garlick knew, or obviously should have known, that a transfer from the MHU would be detrimental to Mr. Rasho's mental health." (ECF No. 72 at 49). Rasho also alleges that Dr. Garlick was aware of Rasho's serious mental health needs and not only disregarded them, but actively undermined the chances of Rasho receiving adequate treatment by transferring Rasho out of the MHU in a spiteful response to Rasho filing too many grievances.

6

Dr. Willard Elyea

Dr. Elyea was the Agency Medical Director for IDOC from 1999 to April 2007. Plaintiff alleges that Dr. Elyea failed to properly supervise the contract between the IDOC and Wexford, the entity that provides health care services at various prison facilities in Illinois, including Pontiac. (ECF No. 72 at 55).

Dr. Wendy Navarro (Blank)

Dr. Navarro has a Ph.D. in clinical psychology and held the position of Director of Mental Health for the Illinois Department of Corrections from June 2006 to July 2012. On June 1, 2012, Dr. Navarro drafted new policies and procedures for the treatment of mentally ill inmates. Prior to that time, the Assistant Warden of programs monitored compliance with the mental health procedures at each prison. Plaintiff alleges that Dr. Navarro failed to comply with her duty to promulgate protocols to remedy problems with mental health care provided to him by (1) "presid[ing] over a mental health care regime that she knew was consistently providing inadequate case to all of its patients, [ ]" and "fail[ing] to establish adequate oversight regarding transfer procedures to ensure that inmates like Mr. Rasho would remain in MHU if necessary." (ECF No. 72 at 53).

Eddie Jones

Jones is the Warden at Pontiac Correctional Center. Plaintiff argues that Jones was ultimately in charge of ensuring compliance with the policies and procedures set by the Chief of Mental Health's Office. Plaintiff's also argues that the ultimate decision to move the inmate from one housing unit to another was Jones' responsibility. Plaintiff alleges that Jones failed to comply with this duty by failing to ensure that Plaintiff would not be moved into terrible conditions of the North Segregation unit. (ECF No. 72 at 58).

7

Non-parties (Dr. Jose Mathews, Plaintiff's Expert Dr. Joel M. Silberberg and Defendant's Expert Dr. Michael Jarvis)

Dr. Jose Mathews was a staff psychiatrist at Pontiac from August 12, 2008, to September 19, 2012. Mathews worked outside of the MHU at Pontiac and treated Plaintiff while Plaintiff was outside the MHU. At the time Dr. Mathews first assessed Plaintiff, Plaintiff had a diagnosis of bipolar disorder which Dr. Mathews continued and treated Plaintiff for. On September 10, 2008, Plaintiff reported that he had not self-mutilated for over one year. In the first two and a half years after Dr. Mathews started working at Pontiac, he saw Plaintiff approximately 10 or 15 times. Dr. Mathews did not recommend that Plaintiff be transferred to the MHU before Plaintiff was transferred to Stateville Correctional Center in 2011. Dr. Mathews believes that Plaintiff started to benefit from his treatment toward the end of his time treating Plaintiff. Dr. Mathews does not recall Plaintiff cutting himself during the time Dr. Mathews treated him.

Dr. Joel M. Silberberg, Plaintiff's retained expert, agrees that during the times when Plaintiff was appropriately treated, he still engaged in bad behaviors. Dr. Silberberg also agrees that Dr. Mathews' treatment of Plaintiff met the standard of care and that Plaintiff was doing well under Dr. Mathews' treatment. Further, Dr. Silberberg testified that placement in the MHU does not prevent self-injurious behavior. He agrees that Plaintiff was cutting on himself when he refused his medications and when he was taking his medications. He additionally testified that past history is an important part of understanding a patient's current condition. Dr. Silberberg has no criticism of the medications prescribed for Plaintiff and he agrees that Dr. Massa prescribed Plaintiff appropriate medications. He also testified that he would place Plaintiff in the MHU regardless of Plaintiff's requests for placement.

Dr. Michael Jarvis, Defendant's retained expert, concluded that Plaintiff's documented behavior is consisted with the diagnosis of antisocial personality disorder. He also testified that

Plaintiff's history shows that prescribed medications provided little benefit and that his self-injurious behavior occurred while he was on and off his medication. It is Dr. Jarvis' opinion that Defendant's provision and discontinuation of medications for Plaintiff based upon his behavior was within the standard of care.

## ANALYSIS

Prison officials violate the Eighth Amendment proscription against cruel and unusual punishment when they display "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *see also Meriwether v. Faulkner*, 821 F.2d 408, 411 (7th Cir. 1987). The injury or need must be objectively serious, and the official must personally know of the risk and consciously disregard it. *See Henderson v. Sheahan*, 196 F.3d 839, 845 (7th Cir. 1999); *Mathis v. Fairman*, 120 F.3d 88, 91 (7th Cir. 1997); *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001). An objectively serious injury or medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001) (quoting *Zentmyer v. Kendall County*, 220 F.3d 805, 810 (7th Cir. 2000) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997))).

The medical care Plaintiff received "may not have been entirely to his satisfaction, but the Constitution does not guarantee a prisoner's choice of a physician, a mode of treatment, or a place of treatment, nor does it (or could it) guarantee a particular outcome or level of comfort in the face of physical maladies." *Gerald v. Ind. Dep't of Corr.*, No. 1:08-cv-706-DFH-TAB, 2009 WL 1795178, at *3 (S.D. Ind. June 23, 2009) (citations omitted). It is also not the courts' practice to pass judgment upon whether the treatment decision made was the correct one. *See Estelle*, 429 U.S. at 107-08 (deciding that the lower appellate court erred in holding that the

alleged insufficiency of medical treatment required reversal and remand); *Pinon v. Wisconsin*, 368 F. Supp. 608, 610 (E.D. Wis. 1973) (noting courts' general refusal to second-guess professional judgment of physicians who actually treat inmates); *see also Maize v. Normand*, 2013 WL 1288046, at *3 (E.D. La. March 11, 2013) ("[M]atters of professional medical judgment are better left to the medical expertise of physicians rather than to the legal expertise of judges."); *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976) (noting that the courts are not to engage in every case in the process of second-guessing the adequacy of medical care that the state provides).

For a medical professional to be liable for deliberate indifference to an inmate's medical needs, he must make a decision that represents "'such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment.'" *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008) (*quoting Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998)); *see also Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006).

Rasho's theory against Dr. Massa generally rests on the proposition that Dr. Massa transferred him out of the MHU in retaliation for complaints against the staff at Pontiac and filing grievances. (ECF No. 71 at 96). In support of his theory, Rasho first asserts that Dr. Massa directly told him that this was the reason for the transfer. (*See e.g.* ECF No. 71-8 at 6). Notably, however, Rasho was not definitive in exactly what was said, explaining that "[b]asically, yes, that's what it came down to." *Id.* But the record is more problematic for Rasho regarding his allegations that he received inadequate care while housed in the North Segregation unit.

Rasho argues that inmates in the MHU have greater access to mental health professionals and receive greater continuity of care vis-à-vis those in North Segregation. (*See* ECF No. 71 at 95). Additionally, Rasho asserts that an inmate in the MHU also has access to group therapy, open bars on the cells and more access to private conversations. *Id*. These services are not available in the North Segregation unit. There is also some evidence that North Segregation is louder and dirtier than MHU. But, as noted above, the Constitution does not guarantee "a mode of treatment [ ] or a place of treatment." *Gerald,* 2009 WL 1795178, at *3.

In this case, Plaintiff acknowledged he could be, and was at times, provided "appropriate and reasonable" care while he was housed in the North Segregation unit. (ECF No. 61 at 7, ¶ 48; *see also* ECF No. 72 at 4). In fact, Plaintiff's expert witness testified in deposition that the care provided to Plaintiff by Dr. Matthews was within the standard of care. The testimony went as follows:

> *Q. Well, as it relates to Mr. Rasho, is it your opinion that the mental health care of Dr. Matthews was appropriate?*
>
> *A. It was the best compromise that could be worked out. Dr. Matthews extended himself in order to make sure that Mr. Rasho got the best possible treatment.*
>
> *Q. Was his care and treatment within the standard of care?*
>
> *A. Yes.*
>
> *Q. So it was appropriate and reasonable?*
>
> *A. He extended himself to make it appropriate and reasonable, yes.*

(ECF No. 72-10 at 10).

\*\*\*

> *A. With the additional time and attention that Dr. Matthews provided to him - - and as we've said before, we don't know where that care was provided – it appeared that Rasho was doing well at the time he was under the care of Dr. Matthews two hours per week.*

(ECF No. 72-10 at 17).

***

*Q. [ ]. But are you agreeing that if he was getting adequate mental health treatment in the segregation unit that it's appropriate for him to be in the segregation unit?*

*A. Hypothetically if somebody was, but he was not, then it would be appropriate.*

(ECF No. 72-10 at 23).

Notably, the record in this case shows that Dr. Mathews did not start working at Pontiac until August 12, 2008, approximately 20 months after Rasho was first transferred out of MHU. But even so, the importance of Plaintiff's expert's testimony is the fact that Rasho was capable of getting "appropriate and reasonable" treatment while being housed in North Segregation unit. Given this, it is difficult to find that Dr. Massa's recommendation to transfer Rasho to North Segregation would violate the Constitution. The Court recognizes that there may be differences, even substantial differences, in the comforts, services and access to care in MHU and North Segregation unit, but the record in this case shows that "appropriate and reasonable" care could be provided in either location for this Plaintiff.

The Court is also mindful that Plaintiff implies that Dr. Massa was aware of the substantial risk of harm to Rasho if he was transferred out of the MHU. This could, of course, be despite the fact that "appropriate and reasonable" care *could* be provided, Dr. Massa knew that it would not be. However, the Court finds that the record is void of any such evidence. Again, the evidence certainly demonstrates a difference in the locations (*see e.g.* ECF No. 71 at 96, Plaintiff alleges that "North Segregation is loud, dirty, and has a foul odor, and there is less sunlight than in the Mental Health Unit[,]" and "[i]nmates in the North Segregation Unit are kept isolated and treated like a "wild animal.""), but the inquiry is not about the level of Plaintiff's "comfort in the face of physical maladies." *Gerald,* 2009 WL 1795178, at \*3; (*see also* ECF No. 71 at 96

12

regarding Plaintiff's allegation that "there is no meaningful mental health treatment available in the North Segregation Unit[ ]" *compared with* Plaintiff's expert's testimony above). This Court must focus on whether there is evidence of a substantial departure from acceptable professional judgment, practice or standards. *See Sain v. Wood*, 512 F.3d at 895. Transferring Plaintiff to a location where he could still receive "appropriate and reasonable" care does not deviate from this standard. Accordingly, based on the theory advanced by Rasho in this case, the Court finds that summary judgment in favor of Dr. Massa is appropriate.

The Court would also note that the connection of the physical injury allegedly sustained as a result of the transfer out of the MHU is highly questionable. Indeed, Plaintiff's expert testified as follows:

> *Q. Okay. But you've also told me that the care and treatment Mr. Rasho received while he's in the mental health unit was appropriate, correct?*
>
> *A. Yes.*
>
> *Q. So we can't attribute his cutting while he's in the mental health unit to Dr. Massa, but you are attributing his cutting after he leaves the mental health unit to Dr. Massa?*
>
> *A. Yes, because he was denied access to care, he was denied standard-of-care treatment for a serious Axis I disorder.*
>
> *Q. Okay. So you're saying that Dr. Massa caused Mr. Rasho to cut on himself because he was denied appropriate treatment while he was in the north seg unit before he sees Dr. Matthews, correct?*
>
> *A. Yes, and he was - -*
>
> *Q. Okay.*
>
> *A. - - exposed to a noxious environment for a mentally ill offender.*
>
> *Q. What was the cause of all of Mr. Rasho's cutting before he left the mental health unit?*

> *A. He has a serious Axis I mental illness. He's been diagnosed with psychosis NOS, he's been diagnosed with bipolar disorder, he's been diagnosed with an impulse control disorder all by physicians within the IDOC.*
>
> *He's a very, very sick man, and he – the illness led to some of the self-destructive behavior and he needed on-going treatment.*
>
> *Q. Would you agree with me that all of those mental illnesses that Mr. Rasho has been diagnosed with may have caused or contributed to cause him to cut himself?*
>
> *A. Yes.*
>
> *Q. And would you agree with me that Mr. Rasho is going to cut himself regardless of what therapies he may or may not be receiving because of the mental illnesses he suffers from?*
>
> *A. I can't answer yes or no to that. I can answer that with the state-of-the-art treatment, the chance of him cutting himself is less. State-of-the-art and appropriate treatment.*

(ECF No. 72-10 at 11-12) (Emphasis added). Ultimately, Plaintiff's own expert appears unable to testify whether the reason was Rasho's injury was because of his mental illnesses or because of his physical location but rather only that it was "less" likely an injury would occur in the MHU. The Court is left to question how a jury could make such a determination without any evidence to link the alleged injury and Dr. Massa's action. In fact, it is undisputed that when Rasho was in the MHU, he cut himself, and after his depature from the MHU, at least during the time that Dr. Mathews was treating Rasho, Dr. Mathews could not recall Rasho ever cutting on himself. Based on this record, the Court cannot find that there is evidence to support Rasho's position that Dr. Massa's recommendation that Rasho be transferred to the North Segregation unit caused any of his physical injuries. Notably, under the Prison Litigation Reform Act, 42 U.S.C § 1997e(e), "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in

section 2246 of title 18)." The inability to present evidence of the physical injury also bars Rasho's claim against Dr. Massa. *Id.*; *see also Zehner v. Trigg*, 133 F.3d 459 (7th Cir. 1997).

For the reasons explained above, Plaintiff's action against the Defendants Dr. Elyea, Dr. Dr. Navarro, Jones, and Dr. Garlick also must be dismissed. Dr. Garlick was further removed from the decision than Dr. Massa, and as noted above, the evidence fails to demonstrate that Dr. Garlick knew that a transfer from the MHU would be detrimental to Mr. Rasho's mental health. As it relates to this Plaintiff, there is no evidence that Dr. Elyea's alleged failure to properly supervise the contract between the IDOC and Wexford resulted in any harm or damage to *this* Plaintiff. Likewise, Dr. Navarro alleged failure to comply with her duty to promulgate protocols to remedy problems with mental health care did not result in any harm or damage to *this* Plaintiff. Finally, Jones alleged failure to comply with this duty by failing to ensure that Plaintiff would not be moved into terrible conditions of the North Segregation unit is not supported by the record. Again, while the conditions were not arguably ideal, the record *in this case* shows that Plaintiff was capable of receiving adequate medical care in North Segregation unit.

Finally, given the Court's finding that there is no genuine issue of material fact to warrant a trial, the Court does not reach the issue of qualified immunity.

**IT IS THEREFORE ORDERED:**

> **1) Defendants Dr. Willard Dr. Elyea, Dr. Wendy Navarro, Eddie Jones, Dr. John Garlick's Motion for Summary Judgment (ECF No. 60) and Defendant Dr. Michael F. Massa's Motion for Summary Judgment (ECF No. 62) on Plaintiff's claim for deliberate indifference to his serious medical need are GRANTED. The Clerk of the Court is directed to enter judgment in favor of these Defendants and against Plaintiff. This case is terminated, with the parties to bear their own costs.**
>
> **2) If Plaintiff wishes to appeal this judgment, he must file a notice of appeal with this Court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4).**
>
> **3) If Plaintiff wishes to proceed in forma pauperis on appeal, his motion for leave to appeal in forma pauperis must identify the issues Plaintiff will present on appeal to**

**assist the Court in determining whether the appeal is taken in good faith. See Fed. R. App. P. 24(a)(1)(c);** *see also Celske v. Edwards***, 164 F.3d 396, 398 (7th Cir. 1999) (an appellant should be given an opportunity to submit a statement of his grounds for appealing so that the district judge "can make a responsible assessment of the issue of good faith.");** *Walker v. O'Brien***, 216 F.3d 626, 632 (7th Cir. 2000) (providing that a good faith appeal is an appeal that "a reasonable person could suppose . . . has some merit" from a legal perspective). If Plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee regardless of the outcome of the appeal.**

ENTERED this 28th day of March, 2014.

/s/ Michael M. Mihm
MICHAEL M. MIHM
UNITED STATES DISTRICT JUDGE